**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DEMARIO G. HIGHT

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

          *Defendant*.

_____/

CASE NO. 2:18-cv-11817
DISTRICT JUDGE STEPHEN J. MURPHY, III
MAGISTRATE JUDGE PATRICIA T. MORRIS

**REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR**
**SUMMARY JUDGMENT (R. 12, 14)**

## I. RECOMMENDATION

Plaintiff Demario Hight appeals the Commissioner's final decision denying him

disability benefits. For the reasons that follow, I conclude that substantial evidence

supports the Commissioner's decision. Therefore, I recommend **DENYING** Plaintiff's

Motion, (R. 12), **GRANTING** the Commissioner's Motion, (R. 14), and **AFFIRMING**

the Commissioner's decision.

## II. REPORT

### A. Introduction and Procedural History[1]

Plaintiff applied for Supplemental Security Income (SSI) in December 2015,

_____

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case
was referred to me for review. (R. 3.)

alleging he became disabled on April 23, 2008. (R. 9, PageID.190.)[2] The Commissioner denied the claim. (*Id.*, PageID.97.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), (*Id.*, PageID.121), which occurred on July 18, 2017. (*Id.*, PageID.91-114.) The ALJ issued a decision on November 20, 2017, finding Plaintiff was not disabled during the relevant period. (*Id.*, PageID.180-90.) The Appeals Council on April 27, 2018, denied review of the ALJ's determination, which then became the Commissioner's final decision. (*Id.*, PageID.31-33.)

Shortly thereafter, Plaintiff sought judicial review of the decision. (R. 1.) He then filed the instant Motion for Summary Judgment on October 15, 2018, (R. 12), the Commissioner countered with its own Motion later in the month, (R. 14), and Plaintiff has replied, (R. 15). The briefing on both sides was first-rate, and the case is now ready for resolution.

### B. Framework for Disability Determinations

SSI is available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

---

[2] The "Disability Determination and Transmittal" form, which provided notice of the initial denial of benefits, as well as the ALJ and the Commissioner, all dated the application as October 26, 2015. (*Id.*, PageID.41, 97; R. 14, PageID.649.) The only disability application in the record says that Plaintiff applied on December 15, 2015, which is the date Plaintiff gives in his brief. (R. 9, PageID.190; R. 12, PageID.626.) Ultimately, the true application date is irrelevant to the issues before the Court.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920(a); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the

3

residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### C. ALJ Findings

Following the sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 9, PageID.48.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. (*Id.*, PageID.43.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "deep vein thrombosis (DVT); protein-S deficiency; diabetes; and obesity." (*Id.*) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id.*, PageID.44.)

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform "light work as defined in 20 CFR 416.967(b)[3] with

---

[3] The regulation defines this work level as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when

the following additional limitations: no requirement for fine visual acuity and the ability to elevate his legs during normal breaks and lunch." (*Id.*) At step four, the ALJ found that Plaintiff could not perform his past relevant work. (*Id.*, PageID.46.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.*, PageID.47.)

### D. Administrative Record

#### 1. Medical Evidence

As explained below, the issue in this case is whether the ALJ erred by refusing to admit a possibly late-submitted treating source opinion. Consequently, a detailed discussion of the record is unnecessary; instead, I will refer to the medical records as needed in the analysis.

#### 2. Application Reports

Plaintiff completed an Adult Function Form in January 2016. (*Id.*, PageID.250.) Asked what conditions impeded him from working, he wrote that "I can't walk or stand up for a period of time. I can't get cut or bump into anything cause I'm at risk because of the blood thinners." (*Id.*, PageID.235.) Before the onset of his conditions, however, he would "workout a lot, clean for myself, shop for myself, go for a long walk everyday, etc." (*Id.*, PageID.236.) Now, however, on a typical day he showered, ate, took medicine, sat with

---

it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

his leg elevated, read, watched television, and then went to bed. (*Id.*) His girlfriend cooked, cleaned, shopped, and washed his laundry. (*Id.*) Other than having to sit while showering, Plaintiff did not indicate any limitations with personal care. (*Id.*) His phone provided reminders for him to take his medicine. (*Id.*, PageID.237.)

He got outside when leaving for doctor's appointments or when family or his girlfriend came over. (*Id.*, PageID.238.) He could ride in a car, but not drive. (*Id.*) And he did not shop; his girlfriend handled that for him. (*Id.*)

His conditions limited a host of abilities: squatting, bending, standing, walking, kneeling, climbing stairs, and completing tasks; but it did not affect sitting, lifting, or reaching, among other things. (*Id.*, PageID.240.) Plaintiff also noted that his illnesses caused depression. (*Id.*, PageID.237.) A doctor had prescribed compression socks in 2005, and he used them every day. (*Id.*, PageID.241.) He also used a cane, but it was not prescribed by a doctor. (*Id.*) He took a long list of prescriptions that had a host of side effects, including dizziness, headache, and blurred vision. (*Id.*, PageID.242.)

### 3. Administrative Hearings

At the hearing, Plaintiff testified that he had stopped working at his last job, sometime over two years prior, because a blood clot in his left leg prevented him from standing longer than three or four hours. (*Id.*, PageID.57, 64.) The blood clot was diagnosed in 2005, and since then he had used a cane for walking and standing. (*Id.*, PageID.60-61.) Around 2011 or 2012, the doctors diagnosed him as a diabetic, the medicine for which hampered his ability to stand because it sapped his energy. (*Id.*, PageID.59-60.) Consequently, from that point on he could stand for only a minute or two until his leg gave

out, even when using his cane. (*Id.*, PageID.58-59.) And he could walk only half a block with the cane; without it, he could not walk at all. (*Id.*, PageID.76.) Recently, he had been to the emergency room after he fell while getting up from a chair. (*Id.*, PageID.72.)

He also needed to sit with his leg elevated to heart level, which his blood specialist recommended to keep the swelling down. (*Id.*, PageID.62.) His attorney asked, "[W]hen did he tell you that because this is something that's not in the record now because you don't see him anymore right?" (*Id.*) "No," Plaintiff replied, the specialist had mentioned leg elevation in 2005. (*Id.*) But it reduced swelling only by about 50 percent, and he needed to keep his left leg elevated 3 to 4 hours a day and at night while he slept. (*Id.*, PageID.63, 67.) His left calf would develop knots, too, but his right leg had no problems. (*Id.*, PageID.64.) His neck pain had cleared. (*Id.*, PageID.72.)

Since the diabetes diagnosis, his condition had deteriorated; notably, his eyes would burn and his vision blur. (*Id.*, PageID.65.) Glasses, which he started wearing the previous year, helped a bit, and he could still read and watch television. (*Id.*, PageID.65-66.) The diabetes medication made him tired, as he had already mentioned, and lead him to nap an hour or two a day. (*Id.*, PageID.66.) Another medication, Coumadin, caused shortness of breath, a condition that twice sent him to the hospital. (*Id.*, PageID.78.)

He lived alone but his girlfriend managed the "hard" household chores, such as mopping, vacuuming, and cooking, none of which he could complete due to his inability to stand. (*Id.*, PageID.69.) He could, however, make his bed, and he also dressed without difficulty. (*Id.*, PageID.69-70.) His driver's license had been suspended for unpaid tickets,

7

but Plaintiff speculated that he would physically be able to drive, although he did not know for how long. (*Id.*, PageID.71.)

The vocational expert (VE) then testified. (*Id.*, PageID.79.) She noted that napping for two hours a day or elevating his leg for three to four would prevent him from working. (*Id.*, PageID.80.) But a worker could elevate his or her legs during the typical break schedule of two 15-minute breaks and a half-hour- or hour-long break. (*Id.*, PageID.80-81.) The ALJ then asked if any jobs would remain available if Plaintiff "was capable of performing work that did not require lifting in excess of 20 pounds on occasion, 10 pounds repeatedly, that allowed him to elevate his legs on breaks and at lunch and did not require fine visual acuity . . . ." (*Id.*, PageID.81.) Under that hypothetical, Plaintiff could do the following jobs: hand packager (130,000 positions nationally), bench assembler (125,000 positions nationally), and "housekeeper, light, unskilled," (120,000 positions nationally). (*Id.*) The VE repeated, however, that if Plaintiff had to nap or elevate his leg as he claimed, he could not perform these jobs. (*Id.*, PageID.82.)

### E. Analysis

#### 1. Factual Background

Plaintiff's lone contention focuses on whether the ALJ should have considered a medical source opinion from Dr. Andrew Thomas, his treating physician, that was submitted on October 8, 2017, well after the hearing but before the decision. (R. 9, PageID.53.) The backstory to this argument begins on July 11, 2017, a week before the administrative hearing, when Plaintiff's counsel wrote to the ALJ that her "office is still awaiting records/evidence from Dr. Andrew Thomas, the claimant's current primary care

8

provider." (*Id.*, PageID.274.) Counsel asked the ALJ to "accept these records and admit them into evidence as soon as they are submitted," and she would "continue to follow up with this provider." (*Id.*) Attached to the letter was a list of the attempts counsel had made to contact Dr. Thomas. (*Id.*, PageID.275.) Beginning on May 25, 2017, she had reached out eight times, faxing an order for records, leaving multiple messages, and contacting Plaintiff, who on July 11 said he would "try to go in directly to get something from them." (*Id.*)

The records had not arrived by the time of the hearing. At the end of the hearing, the ALJ and Plaintiff's attorney had an exchange about evidence that remained outstanding:

| | |
|---|---|
| ALJ: | Is the record complete? |
| ATTY: | No, Your Honor, as I indicated, the -- apparently the medical person at the Dr. Thomas' office has been -- |
| ALJ: | Less than cooperative? |
| ATTY: | Well, no, she got married so -- |
| ALJ: | Oh - |
| ATTY: | -- she's gone and apparently the doctor has gone too so we've -- |
| ALJ: | Okay. |
| ATTY: | -- we've not been able to get anything from either of them. So I don't know apparently they're coming back or -- |
| ALJ: | Hopefully. |

| | |
|---|---|
| ATTY: | Yeah. So, you know, I don't know if you want to leave the record open? I can certainly, you know, follow up. I can obviously if I get something in, I -- I will submit it regardless of -- |
| ALJ: | Well, I don't want to delay. |
| ATTY: | -- delay things, yeah, I understand. |
| ALJ: | Any more than we have to. |
| ATTY: | Yeah. |
| ALJ: | On the other hand, let me do this. I -- well, because it's taking at least a month -- |
| ATTY: | Right. |
| ALJ: | Just to get a -- a decision written. |
| ATTY: | Right. |
| ALJ: | Let me proceed to a decision. |
| ATTY: | Okay. |
| ALJ: | Get this in the -- in the works and since we've already established that your met the requirements of notifying us -- |
| ATTY: | Yes. |
| ALJ: | -- when it comes in, if it changes, I'll change it. |

(*Id.*, PageID.84-85 (*sic* throughout).)

Plaintiff submitted 53 pages of medical records from Dr. Thomas at some point after

the hearing. (*Id.*, PageID.564-616.) Although no records from the time of the filing show

the submission date, Plaintiff's brief to the Appeals Council stated that it was July 21, (*id.*,

PageID.279), and the ALJ noted that these materials were filed "several days after the

10

hearing," (*id.*, PageID.41). In any event, the filing contained medical reports from 2016

through July 6, 2017. (R. 9, PageID.564-616.)

The ALJ had not handed down a decision by October 5, 2017, when Plaintiff visited

Dr. Thomas and received a form indicating that Plaintiff needed to elevate his leg four

times during an eight-hour workday. (*Id.*, PageID.53.) This limitation began on the date of

the appointment and had an indeterminate endpoint. (*Id.*) The only other information on

the form was the basic diagnosis, chronic embolism and deep vein thrombosis, as well as

a checked box indicating Plaintiff "may return to work/school." (*Id.*)

In his decision in November 2017, the ALJ cited the correct regulation, 20 C.F.R. §

416.1435, which as explained more below requires the claimant to submit or inform the

ALJ of evidence at least five days before the hearing; if that deadline is blown, the ALJ

must accept late evidence only in certain situations. (R. 9, PageID.41.) The ALJ disposed

of the matter as follows:

> The claimant submitted or informed the [ALJ] about additional written
> evidence less than five business days before the scheduled hearing date. The
> undersigned [ALJ] admits some, but not all, of the additional evidence.
> Additional treatment records were submitted several days after the hearing
> and exhibited at C11F. However, the treating source statement [from Dr.
> Thomas] submitted several months after the hearing was not admitted due to
> extreme untimeliness.

(*Id.*)

Challenging this decision before the Appeals Council, Plaintiff noted that his

counsel received Dr. Thomas's medical source opinion the day after it was completed and

immediately placed it in the electronic record. (*Id.*, PageID.279.) "Although the report was

generated on October 5, 2017," Plaintiff's counsel wrote,

11

the undersigned had requested evidence from Dr. Thomas including a medical opinion, prior to that date. The specifics of the opinion/evidence that Dr. Thomas was willing to provide, however, were not known to the undersigned attorney given the phone communication with his office was extremely difficult. . . . Therefore, at the time additional records were submitted on July 21, 2017, it was unclear if Dr. Thomas planned on submitting an opinion.

(*Id.*) As noted, the Appeals Council denied review. (*Id.*, PageID.33-34.)

### 2. Legal Background

The issue here is whether the ALJ erred by refusing to accept the medical opinion. In general, an ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[4] group the sources of evidence into two categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 416.913 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 416.913(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 416.913(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value.

---

[4] Various amendments have been made to the regulations since Plaintiff filed his claim. *See, e.g.*, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The parties do not dispute that the amendments to the relevant regulation, 20 C.F.R. § 416.1435, apply here. As for the other amendments, none affect the outcome. Because, as explained below, the treating physician rule remains applicable, and that rule reflects the pre-amendment regulatory scheme, I will discuss those earlier regulations in this general introduction.

20 C.F.R. § 416.927. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R.§ 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

The ALJ here called Dr. Thomas a treating source, and the Commissioner does not dispute that characterization on appeal. (R. 9, PageID.41; R. 14, PageID.651.) Thus, if the ALJ here was required to accept Dr. Thomas's opinion, it might have been entitled to controlling weight.

The issue turns upon the proper interpretation of 20 C.F.R. § 416.1435, which underwent substantial amendments that took effect in May 2017, just before the hearing in this case. Since this provision is new and the relevant caselaw sparse, especially in this Circuit, a glimpse at the regulation's genesis and development is helpful. Until the 2017 amendment, the regulation had not much changed since it was first promulgated to take

13

effect concomitantly with the Title XVI SSI program in January 1974. *See Supplemental Security Income for the Aged, Blind, and Disabled*, 39 Fed. Reg. 5778, 5779 (Feb. 15, 1974) (proposing regulations, including 20 C.F.R. § 416.1427(b), that would be effective until final regulations were adopted); *Supplemental Security Income for the Aged, Blind, and Disabled*, 39 Fed. Reg. 37,976, 37,978 (Oct. 25, 1974) (adopting regulations); *see also* Act of Oct. 30, 1972, Pub. L. 92-603, § 1601-34, 86 Stat. 1329, 1465-78 (1972) (enacting the SSI program with effective date of January 1, 1974). The provision on submitting evidence was part of the regulatory section on requesting a hearing:

> Where possible, documentary evidence which is to be offered at the hearing by the claimant shall be submitted to the presiding officer (see § 416.1429) with the request for hearing or within 10 days after the filing of such request. Every reasonable effort shall be made to insure that all relevant evidence has been received by the presiding officer or will be available at the time and place set for the hearing.

20 C.F.R. § 416.1427(b) (1975). The presiding officer—now dubbed the ALJ—had to provide notice of the hearing "not less than ten days" before it occurred. 20 C.F.R. § 416.1433 (1975).

The regulation's wording was tweaked in 1980 and it was moved to 20 C.F.R. § 416.1435. *Federal Old Age, Survivors, and Disability Insurance Supplemental Security Income*, 44 Fed. Reg. 20,176, 20,196 (April 4, 1979) (proposing the regulation at 20 C.F.R. § 416.1429); *Federal Old Age, Survivors, and Disability Insurance Supplemental Security Income*, 45 Fed. Reg. 52,078, 52,100 (April 4, 1979) ("We have rewritten and reorganized the existing regulations to make them clearer and easier for the public to use. Although no substantive changes have been made in the existing regulations, several provisions have

14

been added to reflect current practice . . . ."). While the agency disavowed any intent to alter the regulation's substance, the 1980 amendments seem to have further softened its already insubstantial requirements:

> If possible, the evidence or a summary of evidence you wish to have considered at the hearing *should be* submitted to the administrative law judge with the request for hearing or within 10 days after filing the request. Each party shall make every effort to be sure that all material evidence is received by the administrative law judge or is available at the time and place set for the hearing.

20 C.F.R. § 416.1435 (1981) (emphasis added). The 10-day notice period for the hearing was retained. 20 C.F.R. § 416.1436 (1981).

Later, a few non-substantive edits of § 1435 were made, and the notice period was lengthened to 20 days before the hearing; otherwise the basic framework from 1980 was in place until the recent changes in 2017. *See* 20 C.F.R. §§ 416.1435, 416.1438 (2016). In that period, § 1435 "require[d] only that a claimant make efforts to have all evidence submitted to the ALJ by the time of the hearing." *Eldridge v. Comm'r of Soc. Sec.*, 137 F. Supp. 3d 1010, 1021 (S.D. Ohio 2015). But no penalties were imposed if the claimant failed to do so and, predictably, evidence often trickled in much later than the rule contemplated. *See Administrative Review Process for Adjudicating Initial Disability Claims*, 70 Fed. Reg. 43,590, 43,596 (July 27, 2005).

Because the late submission of evidence reduced efficiency and "significantly impede[d]" the agency's ability to issue timely ALJ decisions, the Commissioner in 2005 concluded that the "lack of any consequences for violating the time limits [was] a major shortcoming of our current rules." *Id.* At that time, facing the perennial crush of countless

claims, the Commissioner introduced a raft of reforms that it proposed to implement first in the Boston region (*i.e.*, Connecticut, Massachusetts, Maine, New Hampshire, Vermont, and Rhode Island) to test their efficiency. *Id.* at 43,590 (noting the increased size and complexity of the SSI program and stating that "[w] expect that our proposed changes will significantly reduce average disability determination processing time, increase decisional consistency and accuracy, and ensure that the right determination or decision is made as early in the disability determination process as possible"); *Administrative Review Process for Adjudicating Initial Disability Claims*, 71 Fed. Reg. 16,424, 16,441 (Mar. 31, 2006) ("We expect that the experience and knowledge we gain while implementing this rule in the Boston region will help make implementation in the remaining regions proceed more efficiently.").[5]

The rules promulgated in 2006 for the Boston region again provided (after a few non-substantive amendments) that the claimant "should . . . submit information or evidence . . . or any summary of the evidence to the administrative law judge . . . . no later than 5 business days before the date of the scheduled hearing." 20 C.F.R. § 405.331(a) (2016). If

---

[5] Some courts outside the Boston region nonetheless employed the regulation. For example, one court rejected the argument that the regulation was bound to that region, stating such a claim was "unsupported by the case law [and] by the text of the regulation." *Mitchell v. Comm'r of Soc. Sec.*, No. 13CV01969, 2014 WL 3738270, at *3 (N.D. Ohio July 29, 2014) (collecting caselaw). That conclusion, however, overlooked 20 C.F.R. Pt. 405, Subpt. A, App. (2016), which stated that the Commissioner "will apply the procedures in this part [*i.e.*, part 405, including § 405.331], to disability claims . . . filed in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, or Connecticut." None of the cases *Mitchell* relied on cited this provision or even addressed whether the regulation applied outside the Boston region. *See Young v. Colvin*, No. 3:12-CV-245, 2013 WL 4591554, at *5-6 (E.D. Tenn. Aug. 28, 2013) (applying regulation without considering whether it extended to Tennessee); *Ithier v. Astrue*, No. 1:11–cv–238–GRJ, 2013 WL 1092197, at *10 (N.D. Florida, Mar. 14, 2013) (noting that the regulation "plainly appl[ies] to the mental health records in this case"); *Passafiume v. Comm'r of Soc. Sec.*, No. 1:12-cv-0795, 2012 WL 5611501, at *8-9 (N.D. Ohio Nov. 15, 2012) (citing the regulation as applicable).

the claimant failed to do so, the ALJ "may decline to consider the evidence" unless one of three exceptions occurred, in which case the ALJ "will accept the evidence": (1) the Commissioner's action "misled" the claimant; (2) the claimant's limitations prevented him or her from submitting the evidence earlier; or (3) an "unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control" prevented him or her from submitting it on time. 20 C.F.R. § 405.331(a)-(b) (2016). At the same time that teeth were added to the submission requirement, the Commissioner sought to make the new mandate easier to comply with by lengthening the notice period for the hearing. *Administrative Review Process*, 70 Fed. Reg. at 43,597. The claimant would have earlier notice, a full 75 days before the hearing, and thus more time to assemble and submit his or her evidence. 20 C.F.R. § 405.315(a) (2016).

In 2016, the Commissioner began the process of extending these regulations nationwide. The notice of the proposed regulations observed that their application in the Boston region through Part 405 had improved hearing-process efficiency. *Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process*, 81 Fed. Reg. 45,079, 45,082 (July 12, 2016). The regulations became effective in January 17, 2017, but "compliance [was] not required until May 1, 2017." *Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process*, 81 Fed. Reg. 90,987, 90,987 (Dec. 16, 2016).

The final product, which applies here, retained the 75-day notice period. 20 C.F.R. § 416.1438(a). More importantly, the evidence-submission regulation resembles the one that had been used in the Boston region,[6] with a few differences:

(a) When you submit your request for hearing, you should also submit information or evidence as required by § 416.912 or any summary of the evidence to the administrative law judge. Each party must make every effort to ensure that the administrative law judge receives all of the evidence and must inform us about or submit any written evidence, as required in § 416.912, no later than 5 business days before the date of the scheduled hearing. If you do not comply with this requirement, the administrative law judge may decline to consider or obtain the evidence unless the circumstances described in paragraph (b) of this section apply.

(b) If you have evidence required under § 416.912 but you have missed the deadline described in paragraph (a) of this section, the administrative law judge will accept the evidence if he or she has not yet issued a decision and you did not inform us about or submit the evidence before the deadline because:

(1) Our action misled you;

(2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or

(3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:

(i) You were seriously ill, and your illness prevented you from contacting us in person, in writing, or through a friend, relative, or other person;

(ii) There was a death or serious illness in your immediate family;

---

[6] Part 405 was rescinded once the regulations were expanded across the country. *Ensuring Program Uniformity*, 81 Fed. Reg. at 90,994.

> (iii) Important records were destroyed or damaged by fire or other accidental cause; or
>
> (iv) You actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing.

20 C.F.R. § 416.1435; *see also* 20 C.F.R. § 404.935 (identical regulation for the DIB program).[7]

For present purposes, the most important change—and the one that the first part of Plaintiff's argument focuses on, (R. 12, PageID.637)—is that merely informing the ALJ of the evidence at least five days prior to the hearing suffices. 20 C.F.R. § 416.1435(a). In such case, the exceptions are irrelevant. *Ensuring Program Uniformity*, 81 Fed. Reg. at 90,990 ("If a claimant informs an ALJ about evidence 5 or more days before the hearing, there would be no need for the ALJ to find that an exception applies, because the claimant notified us prior to the deadline."); Hearings, Appeals, and Litigation Law Manual (HALLEX), *Admitting Evidence Submitted at Least Five Business Days Before the Hearing*, § I-2-6-58 (May 1, 2017) ("If a claimant or appointed representative informs an ALJ about evidence at least five business days before the date of the scheduled hearing, but does not submit the evidence at least five business days before the date of the scheduled hearing, the ALJ will follow the procedures in HALLEX I-2-5-13 and will consider the evidence regardless of whether the circumstances in 20 CFR 404.935(b) and 416.1435(b) apply.").

---

[7] Plaintiff's brief cites § 404.935 rather than § 416.1435, but this oversight is immaterial given that they are identical. (R. 12, PageID.637-40.)

### 3. Application

#### i. Whether Plaintiff Met the Five-Day Deadline

Plaintiff contends that his counsel's July 11, 2017 letter timely "inform[ed]" the ALJ of Dr. Thomas's statement for purposes of § 416.1435(a). (R. 12, PageID.637.) Plaintiff acknowledges that the letter did not mention the specific statement, which did not yet exist. (*Id.*) But he claims that the letter purposefully stated that both "evidence" and "records" were expected, and it "nevertheless informed the ALJ that there was *at least* some evidence outstanding from this doctor." (*Id.*) In essence, Plaintiff argues for a broad interpretation of "inform" in § 416.1435(a).

The Commissioner, by contrast, seeks to impose a narrower interpretation based on statements in its notice adopting the regulation:

> When a claimant or appointed representative is aware that he or she will need more time to submit evidence in accordance with one of the exceptions, we expect that he or she will provide us with the necessary information in advance. To do so, the claimant or representative should notify the administrative law judge (ALJ) of what the evidence generally consists of and the expected volume of evidence (e.g., one visit to a treating physician or a one-week hospital stay). When the claimant or his or her representative timely provides this information to the ALJ, we expect that evaluating the request for an exception will likely be very simple.

(R. 14, PageID.654-55 (quoting *Ensuring Program Uniformity*, 81 Fed. Reg. at 90,989).) In light of this "guidance," the Commissioner concludes that the letter's vague reference to "evidence" does not sufficiently encompass Dr. Thomas's future source statement. (*Id.*, PageID.655.) Finally, even though the statement had not yet been created when the letter was sent, if Plaintiff had truly intended to request such a statement he could have told that

20

to the ALJ; instead, the subsequent statement appears, to the Commissioner, crafted in response to the VE's testimony at the hearing. (*Id.*, PageID.655-56.)

Regulations are interpreted according to their plain language, with each word receiving its ordinary meaning. *Mitchell v. C.I.R.*, 775, F.3d 1243, 1249 (10th Cir. 2015). "If the regulation is not ambiguous," a court must "apply the plain language of the regulation as written." *Ohio Dep't of Medicaid v. Price*, 864 F.3d 469, 477 (6th Cir. 2017). When the meaning is ambiguous, courts defer to an administrative agency's interpretation of the regulation—but that "deference is warranted *only* when the language of the regulation is ambiguous." *Christensen v. Harris Co.*, 529 U.S. 576, 588 (2000) (emphasis added).

Neither party offers a definition of "inform." This absence of interpretation also means, of course, that the Commissioner has not endeavored to demonstrate that the term "inform" is ambiguous, thus entitling the agency's interpretation to deference.[8] The

---

[8] If there were an interpretive problem here—and there is not, as I explain below—it would not seem to arise from true ambiguity. The parties are not bickering over which of multiple meanings of "inform" applies. Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 32 (2012) ("A word or phrase is ambiguous when the question is which of two or more meanings applies . . . ."). Rather, the dispute, such as it is, centers on the uncertain application of this definition to the letter here. This would be a problem of vagueness. Scalia & Garner, *supra*, at 32. Deference to agency interpretations in this scenario raises concerns. As Justice Scalia warned,

> when an agency interprets its own rules—that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power."

*Decker v. Northwest Envtl. Defense Ctr.*, 568 U.S. 597, 620, (2013) (Scalia, J., concurring in part and dissenting in part) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting)); *see also* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L. Rev. 612, 657 (1996) ("[I]f an agency issues an imprecise

relevant meaning of "inform" is clear. It is defined as "[t]o impart knowledge of some particular fact, occurrence, situation, etc.," or "[t]o give information; to report, relate." *Oxford English Dictionary* (online ed.). And as I show below, there is no ambiguity in applying this definition in the present case.

But assuming that the regulation was muddy enough to merit deference to the agency's interpretation, the Commissioner runs into another problem: the statements for which deference is presumably sought did not purport to interpret the term "inform." The discussion the Commissioner quotes focused on exceptions to the five-day requirement; that is, on situations when the claimant had not submitted or informed the ALJ about the evidence in a timely manner per § 416.1435(a) and instead needed to meet the exceptions listed in § 416.1435(b). *See Ensuring Program Uniformity*, 81 Fed. Reg. at 90,988-89. Thus, the "guidance" the Commissioner provides leads down the wrong path.

To be fair, the Commissioner elsewhere has interpreted "inform" to mean essentially the same thing expressed in the discussion about exceptions; but applying that interpretation here raises other issues. On October 4, 2017, the Commissioner issued Social Security Ruling 17-4p, which states that

> [t]o satisfy the claimant's obligation under the regulations to "inform" us about written evidence, he or she must provide information specific enough to identify the evidence (source, location, and dates of treatment) and show that the evidence relates to the individual's medical condition, work activity, job history, medical treatment, or other issues relevant to whether or not the individual is disabled or blind. If the individual does not provide us with information specific enough to allow us to identify the written evidence and understand how it relates to whether or not the individual is disabled or blind,

_____

or vague regulation, it does so secure in the knowledge that it can insist upon an unobvious interpretation, so long as its choice is not 'plainly erroneous.'").

the individual has not informed us about evidence within the meaning of 20 CFR 404.935, 404.1512, 416.912 or 416.1435, and we will not request that evidence.

2017 WL 476894, at *3. If this Ruling governed the present case—and the Commissioner fails to address the Ruling or seek it application—then the letter would not have "informed" the ALJ of Dr. Thomas's statement, which the letter nowhere mentioned or even hinted at.[9]

---

[9] Whether the Ruling should apply is a tricky question. As an initial matter, although many courts—as seen below—have applied retroactivity analysis to social security rulings, one court in this District rejected that approach because such rulings lack the "force or effect of law in the same manner as do rules and regulations." *Gaffney v. Comm'r of Soc. Sec.*, No. No. 00–10336–BC, 2004 WL 192287, at *1 (E.D. Mich. Jan. 26, 2004). At the same time, however, if SSR 17-4p changed the outcome here, its application would smack of the same objectionable effects, such as impairing rights or attaching new disabilities to past transactions, that have led courts to create a presumption against retroactivity. *See* Scalia & Garner, *supra*, at 261 (discussing the presumption); *see also Soc'y for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767, (Cir Ct, D NH, 1814) (Storey, J.) (describing retroactivity).

And if retroactivity did generally apply to Rulings, the resolution here is not immediately apparent. Generally, Congress must expressly empower an agency to engage in retroactive rulemaking. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). No such power has been bestowed on the Commissioner. *See* 42 U.S.C. § 405(a) (authorizing rulemaking without also allowing retroactivity); *Combs*, 459 F.3d at 642 ("The Act does not generally give the SSA the power to promulgate retroactive regulations."). For this reason, SSR 17-4p could not be retroactive. *See King v. Berryhill*, No. 3:16cv713, 2017 WL 4159608, at *6 n. 3 (E.D. Va. Sept. 19, 2017) ("The Agency [*i.e.*, the Commissioner] does not have the power to engage in retroactive rulemaking. . . . Because the SSR [16-3p] does not have retroactive effect, SSR 96-7 applies to this case."). Further, nothing in SSR 17-4p indicates that the Commissioner intended it to apply retroactively. *Cf. Contreras-Zambrano v. Soc. Sec. Admin.*, 724 F. App'x 700, 704 (11th Cir. 2018) ("[W]e have determined that SSR 16-3p does not apply retroactively because it has no language suggesting, much less requiring, retroactive application."); *Bagliere v. Colvin*, No. 1:16CV109, 2017 WL 318834, at *5 (M.D.N.C. Jan. 23, 2017) (rep. & rec.) ("Moreover, the text of SSR 16-3p contains no statement indicating that the SSA intended that Ruling to apply retroactively.").

This conclusion merely leads to the next question: whether applying SSR 17-4p to the letter would even constitute retroactivity in the first place—if so, then for the reasons above, its application would be prohibited, but if not, then its application is permissible. In general, a retroactive application is one that operates "on transactions that have occurred or rights and obligations that existed before the passage of the" law. 2 Singer, *Sutherland Statutory Construction,* § 41:1 (7th ed.). "[T]he court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268-269 (1994); *cf. id.* at 291 (Scalia, J., concurring in part and concurring in the judgment) ("The critical issue, I think, is not whether the rule affects 'vested rights,' or governs substance or procedure, but rather what is the relevant activity that the rule regulates."); Scalia & Garner, *supra*, at 264 ("[R]etroactivity ought to be judged with regard to the act or event that the statute is meant to regulate."); Singer, *supra*, at §41:2 ("In general, the inquiry into retroactive application of a statute requires a commonsense, functional judgment about new legal consequences that attach to events completed before the statute's passage.").

23

The Court need not decide whether SSR 17-4p applies because Plaintiff would also lose under the ordinary, and possibly broader, definition of "inform" provided above. To "inform" the Commissioner "about . . . written evidence, as required in § 416.912," means to "impart knowledge of some particular fact, occurrence, [or] situation" concerning the evidence. *Oxford English Dictionary* (online ed.). Evidence, in turn, "is anything [the claimant] or anyone else submits to us or that we obtain that relates to your claim," including objective medical evidence such as laboratory findings, medical opinions about what the claimant can still do, medical history, and treatments. 20 C.F.R. § 416.913; *see also* 20 C.F.R. § 416.912 (2016). To satisfy § 416.1435, then, a claimant must impart some knowledge about the particular facts of the written evidence—even such basic information as that the evidence consists of medical opinions or treatment records would constitute particular facts about the evidence.

This interpretation is bolstered by 20 C.F.R. § 416.912, which is referenced in § 416.1435(a). Section 416.912(a) charges a claimant with responsibility to "inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled (see § 416.913)." Informing "about" the evidence thus relates to § 416.913's general definition of "evidence" and its categories of evidence. Imparting knowledge about the

---

Here, the ALJ decision came after the Ruling, but the regulated conduct—informing the ALJ pre-hearing—had long since occurred. Had the Ruling been issued after the decision, the retroactivity of applying it would be clear; yet, allowing it to govern the decision here could retroactively change the legal effect of counsel's letter. The only case to cite the Ruling did not consider its retroactive effect. *Alexander on behalf of M.A.J. v. Berryhill*, No. 4:18CV01512, 2019 WL 1936373, at *12 (N.D. Ohio May 1, 2019). In any event, for reasons discussed in the text, the Court should resolve the case on other grounds.

24

written evidence means, at the very least, providing some information about the different categories or even potential types of evidence that remain outstanding.

But the degree of specificity required is something less than a summary of the evidence, either its contents or form. Recall that in the prior version of the regulation, providing a "summary of the evidence" was the alternative to submitting it. 20 C.F.R. § 416.1435 (2016). The change in language indicates a change in meaning. See Scalia & Garner, *supra*, at 256-60. And from a practical perspective, claimants might frequently be unaware of the exact nature or contents of a medical source's materials, and thus unable provide much detail.

Here, simply telling the ALJ that "records/evidence" from Dr. Thomas exist does not impart any knowledge about an examination three months hence that would produce a treating source statement.[10] Indeed, Plaintiff's counsel acknowledges that she was unsure whether any such statements existed in the batch of records requested, and neither she nor Plaintiff ever told the ALJ of upcoming visits with Dr. Thomas that might generate more written evidence. The letter and its attachment imply that the materials Plaintiff referred to were extant records, not potential reports from unknown future appointments. Plaintiff claims that his counsel used the term "evidence," in addition to "records," as a placeholder for materials that might or might not have existed, (R. 12, PageID.637); but again, this broad term in no way imparted knowledge that Plaintiff would see Dr. Thomas again before

---

[10] This is not to say that the letter was insufficient as to the extant records that Plaintiff submitted shortly after the hearing. Defendant admits the letter may have done enough to "inform" the ALJ of these materials. (R. 14, PageID.655.) But because Plaintiff has not challenged the ALJ's handling of those records, the issue is not before the Court.

the ALJ's decision issued, especially when it appears that neither Plaintiff nor his counsel knew of such a future visit.[11] Consequently, I conclude that Plaintiff did not "inform" the ALJ about Dr. Thomas's statement at least five days before the hearing, 20 C.F.R. § 416.1435(a). Thus, the submission of the statement was untimely.

### ii. Whether an Exception to the Five-Day Deadline Applies

Plaintiff next argues that even if she failed to satisfy § 416.1435(a), any delay in filing was excused by either of two exceptions in 20 C.F.R. § 416.1435(b). (R. 12, PageID.638.) The first is § 416.1435(b)(3)(iv), which gives an example of an "unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control [that] prevent [him or her] from informing us about or submitting the evidence earlier": the claimant "actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing." 20 C.F.R. § 416.1435(b)(3)(iv). Plaintiff contends that this standard was met here because Dr. Thomas "was nearly impossible to reach" by phone, despite repeated efforts. (R. 12, PageID.638.) And as Plaintiff's counsel explained at the hearing, both Dr. Thomas and his "medical records person" had "'been gone' for at least a period of time." (R. 12, PageID.638-39.)

Plaintiff has not explained what unavoidable circumstance prevented him from obtaining a statement earlier than October 5, 2017. His counsel's attempts to collect records

---

[11] As Defendant points out, the assertion in Plaintiff's Appeals Council brief that his attorney requested a "medical opinion" from Dr. Thomas (R. 9, PageID.279) is uncorroborated by record evidence. (R. 14, PageID.658 n. 3.) Neither counsel's letter to the ALJ nor its attachment indicate that an opinion was requested. (R. 9, PageID.274-75.) Tellingly, Plaintiff's briefing here does not contend that he or his counsel asked for a medical opinion. Regardless of what they might have said to Dr. Thomas, the critical inquiry is what information they conveyed to the ALJ. In that regard, the letter and attachment speak for themselves, and neither mentions an opinion.

from Dr. Thomas spanned roughly two months beginning in May 2017 and ending when she obtained and submitted them shortly after the hearing. Around this time, Dr. Thomas was absent for some unknown period, according to Plaintiff. Even so, the records she filed soon after the hearing demonstrate that Plaintiff consistently saw Dr. Thomas both before and throughout this two-month period. (R. 9, PageID.564-606 (containing records from appointments September 2016 through July 2017, including one in May 2017, two in June 2017, and one in July 2017).) Plaintiff offers no reason why he was unable to get a treating source opinion during these sessions. And the mere fact that the opinion was created post-hearing is not cause for finding § 416.1435(b)(3) satisfied—such a rule "would allow every applicant for benefits to submit evidence created after the date of the hearing . . . and thereby obtain reopening of the application for consideration of that evidence. The practical administrative difficulties that would be caused by such a rule are obvious." *Brigham v. Colvin*, No. 1:15-cv-00433-JHR, 2016 WL 4994990, at *2 (D. Me. Sept. 19, 2016) (discussing § 405.331(b)(3)).

Likewise, Plaintiff does not justify the nearly three-month gap between his submission of Dr. Thomas's records and the October 5, 2017, appointment at which he finally received the statement. He does not, for instance, assert that either he or Dr. Thomas was unavailable until that later date, or even that any efforts were made to get the statement prior the October appointment. The tale the record tells is that Plaintiff's counsel made unsuccessful efforts to get unspecified records from May 2017 until July 2017—a period during which Dr. Thomas was present and saw Plaintiff—and then received and submitted

a passel of treatment records in July, after which she made no attempts to obtain them until Plaintiff again had an appointment on October 5.

How was this gap "unusual, unexpected, and unavoidable," or beyond Plaintiff's control? No explanation is offered. As other cases have held, the "unavoidable" circumstance exception is not met when the plaintiff fails to "explain, let alone supply evidence corroborating, when he became aware of the missing records, why he only then became aware of them, how soon afterward he requested them, and what efforts he thereafter made to secure them in a timely fashion." *Freeman v. Colvin*, No. 2:14–cv–412– JHR, 2015 WL 4041733, at *3 (D. Me. July 1, 2015).

It could be contended that the lengthy post-deadline gap is meaningless because § 416.1435(b) focuses on why the claimant failed to timely submit the evidence—once any sufficient justification is offered for the delayed submission, it does not matter how late that submission is. Put differently, the degree of delay is irrelevant if the claimant can justify any delay at all. After all, neither § 416.1435(a) nor (b) establishes deadlines for submission if, respectively, the claimant timely informs the ALJ of the evidence or meets an exception. But, at least regarding the exceptions, the ALJ retains discretion as to "how long the record will remain open to allow submission of the additional evidence." HALLEX, *Closing the Hearing*, § I-2-6-78 (November 20, 2018). And with § 416.1435(b)(3)(iv) in particular, the claimant's diligence in seeking the evidence is part of the inquiry. So Plaintiff's apparent lack of post-deadline efforts to obtain the treating source opinion is relevant in deciding whether the exception applies.

28

For these reasons, I suggest that Plaintiff has not met § 416.1435(b)(3). The parties also offer a few other arguments that should be addressed. They each cite out-of-circuit caselaw addressing the similar exception in 20 C.F.R. § 405.311 (2017), which applied in the Boston region prior to the adoption of § 416.1435. Plaintiff presents cases that state a "rigorous standard" applies to the "unusual, unexpected, or unavoidable circumstance" exception, (R. 12, PageID.639); Defendant offers cases saying the opposite, (R. 14, PageID.657).

It appears that the phrase "rigorous standard" comes from *Raymond v. Astrue*, in which the Court noted that "lack of memory" was insufficient "to meet this rather rigorous standard" in 20 C.F.R. § 405.331(b)(3). No. 1:12–cv–92–DBH, 2012 WL 6913437, at *2 (D. Me. Dec. 31, 2012), *rep. & rec. adopted by* 2013 WL 214569 (D. Me. Jan. 18, 2013). The language stuck, and other courts adopted the adjective "rigorous" to describe the exception. *See, e.g.*, *Jones v. Berryhill*, No. 16-11011-DJC, 2017 WL 3726018, at *11 (D. Mass. Aug. 29, 2017) (applying the "rigorous" standard). Other courts rejected the standard. *See Marino v. United States Soc. Sec. Admin.*, No. 17-cv-179-JL, 2018 WL 4489291, at *3 (D. N.H. Sept. 19, 2018) (discussing the split between courts that apply the "rigorous" standard and those that do not); *Simard v. Colvin*, No. 15–cv–413–SM, 2016 WL 6135444, at *5 (D. N.H. Oct. 21, 2016) ("Parenthetically, the court notes that the district courts in this circuit seem to disagree as to the precise nature of the burden imposed upon claimants by section 405.331. As noted above, those in Maine have described the claimant's burden as 'rather rigorous,' while those in Rhode Island have held it is less demanding and analogized it to 'excusable neglect.'"). The leading decision in this camp

of cases is *Howe v. Colvin*, which concluded that the Social Security Act's remedial purpose made it "impermissible to read 'rigor' into the law." 147 F. Supp. 3d 5, 8 (D.R.I. 2015). *Howe* instead likened the attorney's conduct—"a clerical error that he was able to rectify days before the hearing"—to excusable neglect and found that the ALJ abused her discretion by rejecting the late-submitted evidence. *Id.*

This caselaw is not binding, nor is the debate on the use of "rigorous" terribly persuasive. The dispute is whether to throw an extraneous description atop the regulatory text. None of the cases fleshes out the "standard" with any consistent principle for deciding whether § 416.1435(b)(3) is satisfied—that is, it is not a true standard, *i.e.*, "[a] criterion for measuring acceptability, qualify or accuracy." *Black's Law Dictionary* (10th ed.). If the regulation proves rigorous, this result must come from applying its plain language, not from using a text slathered in adjectives by the caselaw.

Plaintiff also contends that the ALJ's decision ignored the exceptions to the five-day deadline. (R. 12, PageID.640.) Consequently, he claims that the Court cannot accept the Commissioner's post-*hoc* rationalizations here. (R. 15, PageID.666-67 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Palombo v. Berryhill*, No. 17-cv-284-LM, 2018 WL 3118286, at *5 (D.N.H. June 25, 2018).)

It is true that a court cannot accept grounds to justify an administrative action that the agency did not rely on below. *S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is

powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."); *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (6th Cir.1993) (unpublished decision) ("[I]n large part, an agency's decision must be affirmed on the grounds noted in the decision."). The case Plaintiff cites applying this principle in the present context, however, is distinct. In *Palombo v. Berryhill*, the ALJ did not reference the late-submitted evidence or make clear that it was evaluated under § 405.331. 2018 WL 3118386, at *5.

By contrast, the ALJ here did cite the evidence and the proper regulation, including its exceptions to the five-day deadline, and gave a reason for rejecting the proffer: its extreme untimeliness. (R. 9, PageID.41.) Plaintiff points to no regulation that requires the ALJ to do more. *Cf. Midkiff v. Berryhill*, No. 2:18-cv-00338, 2019 WL 1258845, at *2 (S.D.W.V. Mar. 19, 2019) (rejecting argument that the Commissioner's notice adopting § 416.1435 and a 1990s Fourth Circuit case imposed an obligation to discuss the exceptions to the five-day deadline); *April L. v. Comm'r of Soc. Sec.*, No. 3:17-cv-01803-AA, 2019 WL 310122, at *4 (D. Or. Jan. 22, 2019) ("A reasonable reading of § 416.1435(b) indicates that the burden is on the claimant to explain why an exception to the general evidence submission rules should apply. . . Plaintiff provides no reason to believe, via case citations or otherwise, that the burden is on the ALJ to inquire into the exceptions or that failing to do so violates the ALJ's duty to develop the record.").

Indeed, the ALJ complied with the Commissioner's internal guidance on the matter. It states that the ALJ "will explain his or her reason for not considering" late-tendered evidence, and can fulfill this duty by "briefly explain[ing]" that (1) evidence was submitted,

(2) the "claimant did not establish a reason under . . . 416.1435 for" the untimely submission, and (3) the evidence was therefore not considered. HALLEX, *Admitting Evidence Submitted Less Than Five Business Days Before the Hearing or At or After the Hearing*, § I-2-6-59(C) (May 1, 2017). As noted, the reason the ALJ gave was "extreme untimeliness." (R. 9, PageID.41.) Though not phrased in the language of § 416.1435(b)(3), the explanation suffices. It is, in fact, largely the same rationale I rely on above, thus obviating any *Chenery* concerns. The "extreme untimeliness" of the submission was what undercut Plaintiff's justification for the delay: there was no explanation for why it took so long for the statement to be created and submitted. Nothing required the ALJ to expound upon this reasoning. Therefore, the ALJ sufficiently analyzed this issue and rejected Plaintiff's contentions on the same grounds that the Court should ultimately adopt.

Finally, Plaintiff seeks relief under another exception to the five-day deadline, § 416.1435(b)(1), claiming that the ALJ's statements misled him into believing that he could submit Dr. Thomas's statement. (R. 12, PageID.640.) Specifically, he notes the ALJ's line that "since we've already established that [you] met the requirements of notifying us . . . when it comes in, if it changes, I'll change it." (*Id.* (quoting R. 9, PageID.85.).)

Plaintiff's reliance on § 416.1435(b)(1) is unavailing. The exception applies when the Commissioner's misleading actions cause the claimant to miss the five-day deadline. As a simple chronological matter, the ALJ's post-deadline comments here did not cause Plaintiff's earlier failure to timely submit the evidence.[12]

---

[12] Nor, for many of the reasons above, could the ALJ's comments be said to have caused the degree of delay, the "extreme untimeliness" that led the ALJ to reject the submission. (R. 9, PageID.41.) That is, even

Even if the regulation applied, I would not find it met. While the ALJ's comments were less than pellucid, they were not sufficiently misleading as to whether Plaintiff could submit a medical opinion almost three months after the hearing. When Plaintiff's counsel asked if the ALJ would leave the record open, he replied, "Well, I don't want to delay. . . . Any more than we have to." (R. 9, PageID.84.) He next stated that it took "at least a month . . . to get a . . . decision written." (*Id.*, PageID.85.) Only then did he make the statement Plaintiff quotes above. (*Id.*) Thus, the ALJ at most implied the record would remain open for around a month, but only so long as he worked on the decision.

While the ALJ's comment about writing the opinion might suggest that Plaintiff could submit evidence any time before the decision was complete, the ALJ could not have meant to grant permission for something Plaintiff never requested: the creation and submission of new evidence post-dating the hearing. The gist of counsel's pre-hearing letter and her comments at the hearing was that Dr. Thomas possessed evidence already in existence. Plaintiff and his counsel said nothing that would alert the ALJ to the possibility that records from appointments months into the future would be forthcoming. As such, the ALJ's comments could not have conveyed the message that Plaintiff was free generate such new evidence and that it would be admitted without question. For these reasons, I

---

if the ALJ's comments were relevant, they could not have inculcated the belief that Plaintiff could linger for months before again visiting Dr. Thomas and gathering yet more evidence to submit. While the ALJ's statements may explain some of the delay, they cannot account for all of it.

conclude that even if § 416.1435(b)(1) applied, the ALJ did not misled Plaintiff into thinking that records created in October 2017 would be admissible.[13]

### F. Conclusion

I conclude that substantial evidence supports the Commissioner's denial of benefits and I recommend **DENYING** Plaintiff's Motion, (Doc. 12), **GRANTING** the Commissioner's Motion, (Doc. 14), and **AFFIRMING** the Commissioner's decision.

## I.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

---

[13] Because I conclude that the ALJ did not err, I will not address the parties' arguments concerning whether any error was harmless. (R. 12, PageID.641-42; R. 14, PageID.660-61; R. 15, PageID.669-70.)

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 25, 2019                           S/ PATRICIA T. MORRIS
                                               Patricia T. Morris
                                               United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 25, 2019                           By s/Kristen Castaneda
                                              Case Manager

35